Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiffs*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMHITA GERA and DENISH BHAVSAR derivatively on behalf of APPLE INC., | Case No.: |
| Plaintiffs, | |
| v. | **DEMAND FOR JURY TRIAL** |
| TIMOTHY D. COOK, LUCA MAESTRI, KEVAN PAREKH, ARTHUR D. LEVINSON, WANDA AUSTIN, ALEX GORSKY, ANDREA JUNG, MONICA LOZANO, RONALD D. SUGAR, and SUSAN L. WAGNER | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Defendants, | |
| and | |
| APPLE INC., | |
| Nominal Defendant. | |

1

## INTRODUCTION

Plaintiffs Samhita Gera ("Plaintiff Gera") and Denish Bhavsar ("Plaintiff Bhavsar"), (collectively, "Plaintiffs"), by Plaintiffs' undersigned attorneys, derivatively and on behalf of nominal defendant Apple Inc. ("Apple" or the "Company"), file this Verified Shareholder Derivative Complaint against defendants Timothy D. Cook ("Cook"), Luca Maestri ("Maestri"), Kevan Parekh ("Parekh"), Arthur D. Levinson, ("Levinson"), Wanda Austin ("Austin"), Alex Gorsky ("Gorsky"), Andrea Jung ("Jung"), Monica Lozano ("Lozano"), Ronald D. Sugar ("Sugar"), and Susan L. Wagner ("Wagner") (collectively, the "Individual Defendants," and together with Apple, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Apple, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under sections 10(b) and 21D of the Exchange Act against Defendants Cook, Maestri, and Parekh. As for Plaintiffs' complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Apple, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from June 10, 2024 through June 9, 2025, inclusive (the "Relevant Period").

2.      Apple is a California-incorporated international technology company which designs, manufactures, and markets smartphones, personal computers, tablets, wearables, and accessories, in addition to the provision of numerous related services. Its main products are the iPhone, Mac personal computer line, iPad, and several lines of wearable technology and home accessories. Its services include advertising, AppleCare product servicing, cloud (and especially cloud storage) solutions, digital content such as its App Store and Apple TV services, and payment services such as its branded Apple Card credit card and Apple Pay payment network. Apple's software portfolio, notably, includes an artificial intelligence ("AI") component, as well as a basic digital personal assistant named "Siri," first introduced in October of 2011.

3.      Currently, Apple's biggest revenue-generating product/service is the iPhone line of smartphones. The Company generally introduces a new line of iPhones each Fall. Its most recent line was the iPhone 16, introduced in October of 2024.

4.      Despite being a highly influential entity in the technology industry, the recent explosion in AI has posed a problem for Apple as its competitors have begun to develop and/or launch programs incorporating advanced AI capabilities powered by large language models. The two most salient examples of this are Google's Gemini, and Microsoft's Copilot, each of which rely on large language model-style generative AI to power chatbots aimed at serving as personal assistants. Amazon, too, has recently announced that it intends to introduce Alexa+, a conversational, generative-AI iteration of its own virtual assistant, Alexa. These developments pressured Apple to integrate AI technology into its iPhones, and especially into its personal assistant, Siri.

5.      Accordingly, in June 2024, the Company announced that it would be releasing an upgraded version of Siri that would feature advanced capabilities powered by AI at its Worldwide Development Conference ("WWDC," and specifically, the "2024 WWDC"), an annual event at which Apple introduces and showcases its newest technologies. Crucially, Apple flaunted these advanced new capabilities as the primary selling point of

its then-newest line of iPhones, the iPhone 16 line.

6.    The centerpiece of 2024 WWDC was the new Apple Intelligence suite of features, which the Company described as a "personal intelligence system that combines the power of generative models with users' personal context — at the core of iPhone, iPad, and Mac to deliver intelligence that's incredibly useful and relevant." The Individual Defendants claimed that Apple Intelligence, among other things, would make Siri "more deeply integrated into the system experience," leveraging "richer language-understanding capabilities," such that "Siri is more natural, more contextually relevant, and more personal, with the ability to simplify and accelerate everyday tasks." The Individual Defendants further boasted that thanks to Apple Intelligence, Siri could even "follow along if users stumble over words and maintain context from one request to the next." However, investors were unaware, and lacked reason to suspect, that Apple in fact lacked any functional prototype of such an advanced AI-enabled Siri at the time of the 2024 WWDC. Indeed, the Individual Defendants had no reasonable basis even to believe it could deliver the product it was advertising within the iPhone 16 product cycle, if it could *ever* do so.

7.    The truth began to emerge on March 7, 2025, when Apple first publicly announced that it would indefinitely postpone the updates bringing the much-promised AI-enabled features to Siri. At this time, multiple news outlets quoted an Apple spokeswoman as stating that certain features initially announced in June 2024, including Siri's ability to tap into a user's personal information to answer questions and have more precise control over apps, were "tak[ing] [] longer than [the Company] thought" to deliver, and would be delayed until "the coming year." The same day, John Gruber, the writer and producer of the venerable Apple-centric technology blog *Daring Fireball* published this statement, criticizing Apple's promised AI features has having been "vaporware" (i.e., imaginary) and likening the 2024 WWDC advertising to a "concept video." It was also at this time that Apple stopped running advertisements promoting the advanced AI-based Siri features and pulled them from both its official website and YouTube account.

8.     On this news, the price per share of Apple's common stock fell by $11.59, or approximately 4.9%, from a close of $239.07 on March 7, 2025, to close at $227.48 on March 10, 2025.

9.     Less than a week later, on March 12, 2025, Morgan Stanley published a report in which its analyst Erik Woodring lowered his price target for apple from $275 to $252, stating that the delayed implementation of Siri's AI features would negatively impact the iPhone upgrade cycles throughout 2025 and the following year. Furthermore, Woodring presented evidence that approximately 50% of iPhone owners foregoing an upgrade to the iPhone did so because of the delay.

10.     On this news, the price per share of Apple's common stock fell by $11.16 per share, or approximately 5%, over the following two trading sessions, from a close of $220.84 on March 11, 2025, to close at $209.68 per share on close of March 13, 2025.

11.     Subsequently, the *Wall Street Journal* published an article on April 3, 2025 titled "Apple and Amazon Promised Us Revolutionary AI. We're Still Waiting." The article stated in relevant part that "[w]ith 'more personal' Siri … the tech giant[] marketed features [it] ha[d] yet to deliver," suggesting that while such "challenging technology" carried "devastatingly high" costs for "getting it wrong . . . especially" for a company like Apple "that must build trust with customers," the "same responsibility applies to marketing: [t]hey *shouldn't* announce products until they're sure they can deliver them" (emphasis in original).

12.     On this news, the price per share of Apple's common stock fell a further $14.79 per share, or 7.3%, from a close of $203.19 per share on April 3, 2025, to close at $188.13 per share on April 4, 2025.

13.     Finally, June 9, 2025 saw Apple host its WWDC for 2025 (the "2025 WWDC"). Almost a year to the day from first announcing the then-ostensibly imminent AI upgrades to Siri, the Company failed to provide a single update with respect to those features. Several analysts and media outlets described the 2025 WWDC as variations of

"disappointing," with CNN stating that it was "unlikely that any of the announcements made at [the 2025 WWDC] will change the perception that Apple is behind its competitors in AI."

14.     On this news, price per share of Apple's common stock fell a further $2.47, approximately 1.2%, from a close of $203.92 on June 6, 2025, to close at $201.45 on June 9, 2025.

15.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company misrepresented how long it would take to incorporate advanced AI-based Siri features into its devices; (2) therefore, it was highly unlikely that these features would  be made available on the iPhone 16; (3) that failing to implement such features would harm iPhone 16 sales; (4) as a result of the foregoing, that the Company's business and/or financial products were consequently overstated; and (5) as a result, Apple's public statements were false and misleading at all relevant times.

16.     In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Apple to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between June 2024 and March 2025, approximately 361.5 million shares of Apple common stock were repurchased at artificially inflated prices, costing the Company approximately $81.8 billion. As the Company's stock was actually worth only $201.45 per share, the price at which it was trading when markets closed on June 9, 2025, the Company overpaid for repurchases of its own stock by approximately $9 billion in total.

17.     Moreover, four of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated

as a result of the Individual Defendants' false and misleading statements discussed herein, reaping personal profits of approximately $233.1 million dollars.

18.    In light of the Individual Defendants' misconduct—which has subjected the Company and its Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), and Vice President of Corporate Services ("VP Corp. Servs.") to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

19.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

20.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the liability of Defendants Cook, Maestri, and Parekh in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule

10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

22.    This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

23.    Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

24.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25.    Venue is proper in this District because Apple's principal executive offices are in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiffs

26.    Plaintiffs are current shareholders of Apple. Plaintiffs have continuously held Apple common stock at all relevant times.

### Nominal Defendant Apple

27.    Apple is a California corporation with its headquarters at One Apple Park Way, Cupertino, California 95014. Apple's common stock trades on The Nasdaq Stock Market LLC ("NASDAQ") under the ticker symbol "AAPL."

### Defendant Cook

28.    Defendant Cook has served as the CEO of the Company and a Company director since 2011. Before becoming Apple's CEO, Defendant Cook served as the Company's COO from 2005 until 2011.

29.    During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Cook made the following sales of

Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| October 1, 2024 | 253,315 | $226.21 | $57,302,386.15 |
| October 2, 2024 | 223,986 | $225.16 | $50,276,354.68 |
| April 1, 2025 | 110,432 | $223.19 | $24,647,318.08 |
| April 2, 2025 | 108,136 | $223.37 | $24,184,658.50 |

Thus, in total, before the fraud was exposed, Defendant Cook sold 695,869 shares of Company stock on inside information, for which he received approximately $156.4 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

30.     The Schedule 14A the Company filed with the SEC on January 10, 2025 (the "2025 Proxy") stated the following about Defendant Cook:

**Key Skills and Qualifications**

Tim Cook brings to the Board extensive executive leadership experience in the technology industry, including the management of worldwide operations, sales, service, and support.

**Career Highlights**

Mr. Cook, 64, has served as Apple's Chief Executive Officer since 2011, having previously served as Apple's Chief Operating Officer from October 2005.

Mr. Cook joined Apple in March 1998 and served as Executive Vice President, Worldwide Sales and Operations from February 2002 to October 2005. From October 2000 to February 2002, Mr. Cook served as Senior Vice President, Worldwide Operations, Sales, Service and Support. From March 1998 to October 2000, Mr. Cook served as Senior Vice President, Worldwide Operations.

Mr. Cook serves on the Board of Directors of The National Football Foundation & College Hall of Fame, Inc., the Board of Trustees of Duke

University, and on the Leadership Council for the Malala Fund, an international non-profit organization that advocates for girls' education.

**Other Public Company Boards:**

**Current: NIKE, Inc.**

**<u>Defendant Maestri</u>**

31.    Defendant Maestri has served as the Company's VP Corp. Servs. since January 2025. Defendant Maestri previously served as the Company's CFO from 2014 until January 2025.

32.    During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Maestri made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| October 1, 2024 | 67,977 | $226.21 | $15,377,077.17 |
| October 4, 2024 | 59,305 | $226.52 | $13,433,768.60 |

Thus, in total, before the fraud was exposed, Defendant Maestri sold 127,282 shares of Company stock on inside information, for which he received approximately $28.8 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

33.    The Leadership page of the Company's Investor Relations website[1] states the following about Defendant Maestri:

Luca Maestri is Apple's vice president of Corporate Services, reporting to CEO Tim Cook. In this role, he oversees a range of functions, including

---

[1] https://investor.apple.com/leadership-and-governance/person-details/default.aspx?ItemId=c3beaafc-c913-4aee-870d-62524c2e8b10

Verified Shareholder Derivative Complaint

information systems and technology, information security, real estate and development, Caffè Macs, and Claris.

Prior to this role, Luca served as Apple's chief financial officer for a decade, where he led teams responsible for accounting, business support, financial planning and analysis, treasury, real estate, investor relations, internal audit, and tax functions.

He joined Apple in 2013, and has over 30 years of experience building and leading finance teams in global companies with significant operating scale and complexity. Before joining Apple, Luca was CFO at Xerox and previously at Nokia Siemens Networks. Luca began his career with General Motors, and spent 20 years in finance and operating roles in the Americas, Asia Pacific, and Europe.

Luca graduated from Luiss University in Rome with a bachelor's degree in Economics and earned a master's degree in Science of Management from Boston University.

**Defendant Parekh**

34.    Defendant Parekh has served as the Company's Senior Vice President ("SVP") at all relevant times and has served as the Company's CFO since January 2025. Previously, Defendant Parekh held various positions at Apple, including Vice President of Financial Planning and Analysis, and Vice President of Worldwide Affairs.

35.    During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Parekh made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| April 15, 2025 | 7,319 | $202.14 | $1,479,462.66 |
| April 23, 2025 | 4,570 | $206.00 | $941,420.00 |

Thus, in total, before the fraud was exposed, Defendant Parekh sold 11,889 shares of Company stock on inside information, for which he received approximately $2.4 million

in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

36.    The Leadership page of the Company's Investor Relations website states the following about Defendant Parekh:

> Kevan Parekh is Apple's senior vice president and chief financial officer, reporting to CEO Tim Cook. As CFO, Kevan oversees Apple's accounting, business support, financial planning and analysis, treasury, investor relations, internal audit, and tax functions.

> Kevan joined Apple in 2013, and has played a key role in Apple's financial and business planning, and product development planning since then. Prior to becoming CFO, he served as Apple's vice president of Financial Planning and Analysis. Before that, he served as Apple's vice president of Worldwide Finance, supporting a number of different functions throughout his tenure, including Engineering, iTunes, Marketing, Retail, and Sales.

> He has over 20 years of experience leading global finance teams at major companies. Before joining Apple, Kevan held a number of senior leadership roles at Thomson Reuters and General Motors, including working across Europe and Asia.

> Kevan graduated with a Bachelor of Science in Electrical Engineering from the University of Michigan and earned an MBA from the University of Chicago.

**Defendant Levinson**

37.    Defendant Levinson has served as a Company director since 2000, and as Chairman of the Board since at least 2015. Defendant Levinson has served as a member of the People and Compensation Committee.

38.    During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Levinson made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| November 15, 2024 | 75,000 | $224.68 | $16,851,000.66 |
| November 18, 2024 | 75,000 | $228.66 | $17,149,500.00 |
| November 19, 2024 | 50,000 | $229.28 | $11,464,000.00 |

Thus, in total, before the fraud was exposed, Defendant Levinson sold 200,000 shares of Company stock on inside information, for which he received approximately $45.5 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

39.    The 2025 Proxy stated the following about Defendant Levinson:

**Key Skills and Qualifications**

Art Levinson brings to the Board executive leadership experience, including through his service as a chairman and chief executive officer of a large international public company, along with extensive financial expertise and brand marketing experience. Through his experiences at biotechnology and pharmaceutical companies, he also brings significant expertise in the health sector and technology and innovation.

**Career Highlights**

Dr. Levinson, 74, has served as the Chief Executive Officer of Calico, a company focused on health, aging, and well-being, since September 2013.

Dr. Levinson previously served as Chief Executive Officer of Genentech, Inc., a medical drug developer, from July 1995 to April 2009, and served as Genentech's Chairman from September 1999 to September 2014.

Dr. Levinson also serves on the Board of Directors of the Broad Institute of MIT and Harvard and on the Board of Scientific Consultants at the Memorial Sloan Kettering Cancer Center.

Dr. Levinson was awarded the National Medal of Technology and Innovation, the nation's highest honor for achievement and leadership in advancing the fields of science and technology, and the Biotechnology Heritage Award from

the Biotechnology Industry Organization and the Chemical Heritage Foundation. Dr. Levinson has been inducted into the Biotech Hall of Fame.

**Defendant Austin**

40.    Defendant Austin has served as a Company director since February of 2024, and as a member of the Audit and Finance Committee since 2025.

41.    The 2025 Proxy stated the following about Defendant Austin, in relevant part:

**Key Skills and Qualifications**

Wanda Austin brings to the Board executive leadership experience through her service as president and chief executive officer of a large research and development organization, significant expertise in advanced technology and innovation, experience with environment, cybersecurity, and public policy, and a global business perspective from her service on other boards.

**Career Highlights**

Dr. Austin, 70, is the retired President and Chief Executive Officer of The Aerospace Corporation, an independent, non-profit organization performing objective technical analyses and assessments for a variety of government, civil, and commercial customers, operating the only federally funded research and development center committed exclusively to the space enterprise. Dr. Austin served in this role from January 2008 until October 2016. Dr. Austin joined The Aerospace Corporation in 1979, serving in various positions of increasing responsibility.

Dr. Austin is also a Member of the National Academy of Engineering and is a co-founder of MakingSpace, Inc., a leadership and science, technology, engineering, and mathematics (STEM) consulting firm. Dr. Austin was the Interim President of the University of Southern California from 2018 to 2019 and has served on the American Energy Innovation Council since 2017. Dr. Austin also served on the Defense Policy Board from 2017 to 2019, the President's Council of Advisors on Science and Technology from 2015 to 2017, the Defense Science Board from 2009 to 2017, and the NASA Advisory Council from 2005 to 2007 and 2014 to 2016.

**Other Public Company Boards:**

Verified Shareholder Derivative Complaint

**Current: Amgen Inc.; Chevron Corporation**
**Within Last Five Years: Virgin Galactic Holdings, Inc.**

**Defendant Gorsky**

42.    Defendant Gorsky has served as a Company director since 2021. Defendant Gorsky also serves as a member of the Nominating and Corporate Governance Committee and as a member of the People and Compensation Committee.

43.    The 2025 Proxy stated the following about Defendant Gorsky, in relevant part:

**Key Skills and Qualifications**

Alex Gorsky brings to the Board executive leadership experience, as well as brand marketing expertise and extensive experience in the fields of health and technology through his service as a chairman and chief executive officer of a large international public company.

**Career Highlights**

Mr. Gorsky, 64, is the retired Chief Executive Officer and Executive Chairman of Johnson & Johnson, a global healthcare products company. Mr. Gorsky served as Executive Chairman from January 2022 to January 2023, having previously served as CEO from April 2012 and Chair of the Board from December 2012.Mr. Gorsky joined Johnson & Johnson in 1988, serving in various positions of increasing responsibility. In 2004, Mr. Gorsky left Johnson & Johnson to join Novartis Pharmaceuticals Corporation, where he served as head of its pharmaceutical business in North America, before returning to Johnson & Johnson in 2008.

Mr. Gorsky is the co-founder of Freepoint Capital Group and a General Partner at ICONIQ Capital.

Mr. Gorsky serves on the boards of the Travis Manion Foundation, a non-profit organization that empowers veterans to develop character in future generations, and the National Academy Foundation, a non-profit organization that supports career academies within traditional high schools. Mr. Gorsky also serves on the Board of Advisors of The Wharton School. Mr. Gorsky is

the recipient of the Robert F. Kennedy Human Rights Ripple of Hope Award, and the Prix Galien Roy Vagelos Pro Bono Humanum Award.

**Other Public Company Boards:**

**Current: International Business Machines Corporation; JPMorgan Chase & Co.**
**Within Last Five Years: Johnson & Johnson**

## Defendant Jung

44.    Defendant Jung has served as a Company director since 2008. Defendant Jung also serves as the Chair of the People and Compensation Committee and as a member of the Nominating and Corporate Governance Committee.

45.    The 2025 Proxy stated the following about Defendant Jung, in relevant part:

**Key Skills and Qualifications**

Andrea Jung brings to the Board executive leadership experience, a global business perspective, and extensive brand marketing and consumer products experience, including through her service as a chair and chief executive officer of a large international public company, and her service on other boards.

**Career Highlights**

Ms. Jung, 66, has served as the President and Chief Executive Officer and a member of the Board of Grameen America LLC, a nonprofit microfinance organization helping women who live in poverty build small businesses, since April 2014.

Ms. Jung previously served as Executive Chairman of Avon Products, Inc., a personal care products company, from April 2012 to December 2012, and as Chairman of the Board of Avon from September 2001 to April 2012. Ms. Jung served as Chief Executive Officer of Avon from November 1999 to April 2012, and served as a member of Avon's Board from January 1998 to December 2012.

Ms. Jung also serves on the Board of Rockefeller Capital Management.

**Other Public Company Boards:**

**Current: Unilever PLC; Wayfair Inc.**
**Within Last Five Years: Unilever N.V.**

### Defendant Lozano

46.     Defendant Lozano has served as a Company director since 2021. Defendant Lozano also serves as a member of the Audit and Finance Committee.

47.     The 2025 Proxy stated the following about Defendant Lozano, in relevant part:

**Key Skills and Qualifications**

Monica Lozano brings to the Board executive leadership experience, and experience in operations, strategic planning, media and marketing, including through her service as a board chair and chief executive officer, and a global business perspective from her service on other boards.

**Career Highlights**

Ms. Lozano, 68, is the retired President and Chief Executive Officer of the College Futures Foundation, a charitable foundation working to increase the rate of college graduation for low-income California students. Ms. Lozano served in this role from December 2017 to August 2022. Ms. Lozano also co-founded The Aspen Institute Latinos and Society Program and served as Chair of its Advisory Board from January 2015 to October 2019. Her career in media spanned more than 30 years, including as Chair of the Board of Directors of U.S. Hispanic Media, Inc., the parent company of ImpreMedia, a national Hispanic news and information company, from June 2014 to January 2016, and as Chair of ImpreMedia from July 2012 to January 2016 and Chief Executive Officer from May 2010 to May 2014. She also served as Publisher of La Opinión from 2004 to May 2014 and Chief Executive Officer from 2004 to July 2012.

Ms. Lozano serves on the Board of the Weingart Foundation, a private grantmaking foundation advancing racial, social, and economic justice in Southern California, and is a Member of the American Academy of Arts and Sciences.

**Other Public Company Boards:**

**Current: Bank of America Corporation; Target Corporation**

**Defendant Sugar**

48.     Defendant Sugar has served as a Company director since 2010. Defendant Sugar also serves as the Chair of the Audit and Finance Committee.

49.     The 2025 Proxy stated the following about Defendant Sugar, in relevant part:

**Key Skills and Qualifications**

Ron Sugar brings to the Board executive leadership experience as a chairman and chief executive officer of a large international public company, financial expertise as a former chief financial officer, experience in worldwide operations, understanding of advanced technology, experience with government relations and public policy, and a global business perspective from his tenure at global companies and his service on other boards.

**Career Highlights**

Dr. Sugar, 76, is the retired Chairman and Chief Executive Officer of Northrop Grumman Corporation, a global security company. Dr. Sugar served in this role from April 2003 to June 2010 and served as President and Chief Operating Officer from 2001 to 2003. Before joining Northrop Grumman, he held executive positions at Litton Industries and TRW Inc., where he served as Chief Financial Officer.

Dr. Sugar is a Member of the National Academy of Engineering and serves on the Board of Trustees of the University of Southern California and on the Board of the Los Angeles Philharmonic Association. Dr. Sugar was elected as a member of the National Academy of Engineering for major contributions to advanced space communication systems and leadership in aerospace innovation.

**Other Public Company Boards:**

**Current: Uber Technologies, Inc.**

**Within Last Five Years: Air Lease Corporation; Amgen Inc.; Chevron Corporation**

### Defendant Wagner

50.    Defendant Wagner has served as a Company director since 2014. Defendant Wagner also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit and Finance Committee.

51.    The 2025 Proxy stated the following about Defendant Wagner:

**Key Skills and Qualifications**

Sue Wagner brings to the Board operational experience and a global business perspective, including through her service as chief operating officer of a large multinational public company, as well as her service on other boards. Ms. Wagner also brings extensive financial expertise and experience in the highly regulated financial services industry.

**Career Highlights**

Ms. Wagner, 63, is a co-founder of BlackRock, Inc., an asset management company. Ms. Wagner served as BlackRock's Vice Chair from January 2006 until her retirement in July 2012, and also served as a member of BlackRock's Global Executive Committee and Global Operating Committee. During her tenure at BlackRock, Ms. Wagner served as BlackRock's Chief Operating Officer and Head of Corporate Strategy, and led the alternative investments and international client businesses.

Ms. Wagner also serves on the Board of Directors of Color Health, Inc., a privately held health technology company.

**Other Public Company Boards:**

**Current: BlackRock, Inc.; Samsara Inc.**
**Within Last Five Years: Swiss Re**

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

52.    By reason of their positions as officers, directors, and/or fiduciaries of Apple

and because of their ability to control the business and corporate affairs of Apple, the Individual Defendants owed Apple and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Apple in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Apple and its shareholders so as to benefit all shareholders equally.

53.     Each director and officer of the Company owes to Apple and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

54.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Apple, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

55.     To discharge their duties, the officers and directors of Apple were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

56.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Apple, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all

relevant times.

57. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

58. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Apple were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of California and the United States, and pursuant to Apple's corporate governance and applicable codes of conduct and/or ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Apple conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or

practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Apple and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Apple's operations would comply with all applicable laws and Apple's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

59.     Each of the Individual Defendants further owed to Apple and the shareholders the duty of loyalty requiring that each favor Apple's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

60.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Apple and were at all times acting within the course and scope of such agency.

61.     Because of their advisory, executive, managerial, directorial, and controlling positions with Apple, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

62.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Apple.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

63.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

64.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

65.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Apple was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

66.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

67.     At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Apple and was at all times acting within the course and scope of such agency.

## APPLE'S CODE OF CONDUCT

68.     Apple's Business Conduct Policy (the "Code of Conduct") represents that it "applies to all full and part-time employees of Apple and its subsidiaries, and provides a standard guide for what is required of everyone at Apple" and that "[r]elevant sections also apply to members of Apple's Board of directors."

69.     The Code of Conduct states that the Company's business practices are guided by the principles of "[h]onesty—[d]emonstrate honesty and high ethical standards in all business dealings;" "[r]espect—[t]reat customers, partners, suppliers, employees, and others with respect and courtesy;" "[c]onfidentiality—[p]rotect Apple Confidential Information, including that of our customers, partners and suppliers;" and "[c]ompliance—[e]nsure that business decisions comply with applicable laws and regulations."

70.     In the introductory section, titled "The way we do business worldwide," the Code of Conduct states, in relevant part:

> At Apple, we are committed to demonstrating that business can and should be a force for good. Achieving that takes innovation, collaboration, and a focus on serving others.

It also means leading with our values—accessibility, education, environment, inclusion and diversity, privacy, racial equity and justice, and supplier responsibility. Our Business Conduct Policy is foundational to how we do business and how we put our values into practice each and every day.

Apple conducts business ethically, honestly*, and in full compliance with applicable laws and regulations. This applies to every business decision in every area of the company worldwide.* [2]

71.     In the section "Protecting Apple," under the subheading "Accuracy of Business Records and Fraud," the Code of Conduct states, in relevant part:

Accurate and honest business records are critical to meeting our legal, financial, and management obligations. You should ensure that all business records and reports, including expense reports, timecards, information related to employee benefits such as the Apple Matching Gifts Program and Employee Purchase Plan, customer information, and technical and product information that appear in any format, including correspondence and public communications, are comprehensive, fair, accurate, timely, and understandable.

Intentional manipulation of Apple business records is a form of fraud. This includes modifying business records or reports in any way, misstating business facts, or omitting critical business information to mislead others, or assisting others in doing so.

You are responsible for observing all policies and procedures regarding business expenses, including meal and expenses, and for submitting accurate expense reimbursement reports. Guidelines on daily meal expenses vary worldwide. For more information, see the Travel and Expense Policy.

72.     In the section "Avoiding Conflicts of Interest," the Code of Conduct states, in relevant part:

A conflict of interest is any activity that may damage Apple's business, competitive, or financial interests, or gives the appearance of impropriety or divided loyalty. Avoid any situation that creates a real or perceived conflict of interest. If you are unsure about a potential conflict, talk to your manager, Business Conduct, or your People Business Partner.

---

[2] All emphasis herein is added unless stated otherwise.

Members of Apple's Board of Directors should follow the requirements and procedures described in the Guidelines Regarding Director Conflicts of Interest.

73.    In the section "Insider Trading" the Code of Conduct states, in relevant part:

Never buy or sell Apple securities, including Apple stock, if you are aware of information that has not been publicly announced and that could have a material effect on the value of the securities. It is illegal and against Apple policy to give anyone, including friends and family, tips on when to buy or sell securities when aware of material nonpublic information concerning that security. This applies to decisions to buy or sell Apple stock or the stock of an Apple supplier, manufacturer, vendor, or customer, such as cellular network carriers or other channel partners.

Information is material if it would likely be considered important by an investor who is deciding whether to buy or sell a security, or if the information is likely to have a significant effect on the market price of the security. Both positive and negative information may be considered material. Examples of potential material information include financial results, information about new products or significant features, timing of significant product announcements or new product introductions, news of a pending or proposed acquisition or other corporate transaction, significant changes in sources or availability of supplies, changes in dividend policy, significant product defects or modifications, and significant cybersecurity, or other data protection or privacy incidents.

Short sales, transactions that hedge or offset, or are designed to hedge or offset any decrease in the value of Apple securities and transactions in derivatives of Apple stock, are prohibited at all times, including transactions involving prepaid variable forward contracts, equity swaps, collars, options, warrants, puts, calls, or similar instruments related to shares of Apple stock.

74.    Regarding waivers, the Code of Conduct states:

Any waiver of this Policy for our directors, executive officers, or principal accounting officer may be made only by our Board of Directors, and will be disclosed as required by law or applicable listing rules.

75.    Regarding employee "Responsibilities and Obligation to Take Action," the

Code of Conduct states:

> Everything we do is a reflection of Apple. We expect you to:
>
> • **Follow the Policy and exhibit appropriate workplace behavior.** Comply with the letter and spirit of Apple's Business Conduct Policy and all applicable legal requirements. Any failure to exhibit ethical or appropriate workplace behavior or to comply with Apple's Business Conduct Policy—or failure to report a policy, regulatory, or legal violation—may result in disciplinary action, up to and including termination of employment.
>
> • **Speak up.** If you see or hear of any violation of Apple's Business Conduct Policy, other Apple policies, or legal or regulatory requirements, you must notify either your manager, People Team, Legal, or Business Conduct.
>
> • **Use good judgment and ask questions.** Apply Apple's principles of business conduct, and review our policies and legal requirements. When in doubt about how to proceed, discuss it with your manager, your People Business Partner, Legal, or Business Conduct.
>
> You are also required to fully cooperate in any Apple investigation and safeguard the integrity of the investigation.

76.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Moreover, four of the Individual Defendants violated the Code of Conduct by engaging in insider trading, netting aggregate proceeds of approximately ***$233.1 million***. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical

manner, and properly report violations of the Codes of Conduct.

**APPLE'S AUDIT AND FINANCE COMMITTEE CHARTER**

77. Apple also maintains an Audit and Finance Committee Charter (the "Audit Committee Charter") which governs the Audit and Finance Committee's roles and responsibilities. The Audit Committee Charter states the following regarding the purpose of the Audit Committee under the heading "Purpose of the Committee:"

The purpose of the Committee is to:

1. Assist the Board in oversight and monitoring of:

• the Corporation's financial statements and other financial information provided by the Corporation to its shareholders and others;

• compliance with legal, regulatory and public disclosure requirements;

• the independent auditors, including their qualifications and independence;

• the Corporation's systems of internal controls, including the Internal Audit function;

• treasury and finance matters;

• enterprise risk management, privacy and data security; and

• the auditing, accounting, and financial reporting process generally.

2. Prepare the committee report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Corporation's annual proxy statement. The Committee does not itself prepare financial statements or perform audits, and its members are not auditors or certifiers of the Corporation's financial statements. It is not the duty of the Committee to conduct audits or to determine that the Corporation's financial statements and disclosures are complete and accurate and are in accordance with U.S. Generally Accepted Accounting Principles ("GAAP") and applicable rules and regulations. These duties are the responsibilities of management and the independent auditors.

78.    Under the heading "Duties and Responsibilities," in a subsection titled "Financial Reporting," the Audit Committee Charter states the following, in relevant part:

9. Review with management and the independent auditor:

• the Corporation's annual audited financial statements, and related footnotes, and quarterly unaudited financial statements, including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Corporation's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;

• the independent auditors' audit of the annual financial statements and their report thereon;

• the accompanying management letter and any reports with respect to interim periods;

• any material changes to the Corporation's accounting principles and practices used in preparing financial statements to be filed with the SEC;

• any significant changes required in the independent auditors' audit plan;

• other matters related to the conduct of the audit that are to be communicated to the Committee under the auditing standards of the Public Company Accounting Oversight Board.

10.    Review with management, the independent auditors, and the Corporation's counsel, as appropriate, any legal and regulatory matters that may have a material impact on the financial statements, related compliance policies, and programs and reports received from regulators.

11. Review and discuss earnings press releases, including the use of non-GAAP financial measures, prior to public disclosure.

12. Provide a report for inclusion in the Corporation's proxy statement in accordance with the rules and regulations of the SEC.

13. Oversee compliance with the requirements of the SEC for disclosure of auditors' services and audit committee member qualifications and activities.

Verified Shareholder Derivative Complaint

14. Discuss with the independent auditors the financial statements and audit findings, including any significant adjustments, management judgments and accounting estimates, significant new accounting policies and any other matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board and the SEC, as in effect at the time in the case of annual statements, and Auditing Standard 4105, as in effect at the time in the case of quarterly statements.

79.     Under the same heading, in a subsection titled "Internal Control Over Financial Reporting and Disclosure Controls and Procedures" the Audit Committee Charter states the following, in relevant part:

15. Review the adequacy of the Corporation's internal control over financial reporting and the disclosure controls and procedures designed to ensure compliance with applicable laws and regulations.

16. Consider and review with the independent auditor and the head of Internal Audit the adequacy of the Corporation's internal controls and any related significant findings and recommendations of the independent auditor and internal auditors together with management's responses thereto.

17. Periodically review with management any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting, any fraud involving any employees who have a significant role in the Corporation's internal control over financial reporting, and any significant changes in internal control over financial reporting or in other factors that could significantly affect internal control over financial reporting, including management's responses thereto.

18. Establish procedures for receiving, retaining and treating complaints received by the Corporation regarding accounting, internal accounting controls, or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

80.     In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and

to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## FALSE AND MISLEADING STATEMENTS

### Background

81.     Apple is a technology company that designs, manufactures, and markets smartphones, personal computers, tablets, wearables, and accessories, in addition to the provision of numerous related services. Among the Company's premier products are the iPhone, Mac personal computer line, iPad, and several lines of wearable technology and home accessories. Among the various services the Company offers are its AppleCare product servicing, cloud (and especially cloud storage) solutions, digital content development such as its App Store and Apple TV services, and payment services such as its branded Apple Card credit card and Apple Pay payment network.

82.     Currently, the iPhone line of smartphones is the Company's largest revenue generator. New versions of the iPhone are typically introduced annually in the fall. The most recent version was the iPhone 16, introduced in October of 2024.

83.     Apple's competitors have begun to develop and/or launch programs which incorporate advanced AI capabilities powered by large language models. The two most prominent examples of this are Google's Gemini, and Microsoft's Copilot, each of which rely on large language model-style generative AI to power chatbots aimed at serving as personal assistants. Amazon, too, has recently announced that it intends to introduce Alexa+, a conversational, generative-AI iteration of its own virtual assistant, Alexa. Despite being a highly influential entity in the technology industry, the recent explosion in

These developments led Apple to integrate AI technology into its iPhones, and especially into its personal assistant, Siri. However, despite its storied history in the technology space, the recent explosion in AI has posed a problem for Apple.

84.    At the 2024 WWDC, the Company introduced its new Apple Intelligence suite of features, which the Company described as a "personal intelligence system that combines the power of generative models with users' personal context — at the core of iPhone, iPad, and Mac to deliver intelligence that's incredibly useful and relevant." The infusion of Apple Intelligence was set to make Siri "more deeply integrated into the system experience," leveraging "richer language-understanding capabilities," such that "Siri is more natural, more contextually relevant, and more personal, with the ability to simplify and accelerate everyday tasks." As a result, Siri could even "follow along if users stumble over words and maintain context from one request to the next."

### *June 10, 2024 Press Release*

85.    On June 10, 2024, the Company issued a press release titled "Introducing Apple Intelligence, the personal intelligence system that puts powerful generative models at the core of iPhone, iPad, and Mac." This press release highlighted the list of upgrades to Siri in connection with the 2024 WWDC, stating in relevant part:

> Apple today introduced Apple Intelligence, the personal intelligence system for iPhone, iPad, and Mac that combines the power of generative models with personal context to deliver intelligence that's incredibly useful and relevant. Apple Intelligence is deeply integrated into iOS 18, iPadOS 18, and macOS Sequoia. It harnesses the power of Apple silicon to understand and create language and images, take action across apps, and draw from personal context to simplify and accelerate everyday tasks. With Private Cloud Compute, Apple sets a new standard for privacy in AI, with the ability to flex and scale computational capacity between on-device processing and larger, server-based models that run on dedicated Apple silicon servers.

> "We're thrilled to introduce a new chapter in Apple innovation. Apple Intelligence will transform what users can do with our products — and what our products can do for our users," said [Defendant] Cook[.] "Our unique

approach combines generative AI with a user's personal context to deliver truly helpful intelligence. And it can access that information in a completely private and secure way to help users do the things that matter most to them. This is AI as only Apple can deliver it, and we can't wait for users to experience what it can do."

*\*\*\**

**Siri Enters a New Era**

***Powered by Apple Intelligence, Siri becomes more deeply integrated into the system experience. With richer language-understanding capabilities, Siri is more natural, more contextually relevant, and more personal, with the ability to simplify and accelerate everyday tasks. It can follow along if users stumble over words and maintain context from one request to the next.*** Additionally, users can type to Siri, and switch between text and voice to communicate with Siri in whatever way feels right for the moment. Siri also has a brand-new design with an elegant glowing light that wraps around the edge of the screen when Siri is active.

*\*\*\**

Siri can now give users device support everywhere they go, and answer thousands of questions about how to do something on iPhone, iPad, and Mac. Users can learn everything from how to schedule an email in the Mail app, to how to switch from Light to Dark Mode.



Now Siri can give users device support everywhere they go, answering thousands of questions about how to do something on iPhone, iPad, and Mac.

Verified Shareholder Derivative Complaint

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

***With onscreen awareness, Siri will be able to understand and take action with users' content in more apps over time.*** For example, if a friend texts a user their new address in Messages, the receiver can say, "Add this address to his contact card."



***With Apple Intelligence, Siri will be able to take hundreds of new actions in and across Apple and third-party apps***. For example, a user could say, "Bring up that article about cicadas from my Reading List," or "Send the photos from the barbecue on Saturday to Malia," and Siri will take care of it.



***Siri will be able to deliver intelligence that's tailored to the user and their on-device information***. For example, a user can say, "Play that podcast that Jamie recommended," and Siri will locate and play the episode, without the user having to remember whether it was mentioned in a text or an email. Or they could ask, "When is Mom's flight landing?" and Siri will find the flight details and cross-reference them with real-time flight tracking to give an arrival time.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

***August 1, 2024 Press Release***

86.    On August 1, 2024, the Company issued a press release announcing its financial results for the third quarter of the 2024 Fiscal Year.[3]  In relevant part, this press release quoted Defendant Cook in stating that:

> "Today Apple is reporting a new June quarter revenue record of $85.8 billion, up 5percent from a year ago . . . During the quarter, we were excited to announce incredible updates to our software platforms at our Worldwide Developers Conference, including Apple Intelligence, a breakthrough personal intelligence system that puts powerful, private generative AI models at the core of iPhone, iPad, and Mac. We very much look forward to sharing these tools with our users, and we continue to invest significantly in the innovations that will enrich our customers' lives, while leading with the values that drive our work."

***August 1, 2024 Earnings call***

87.    On August 1, 2024, the Company held an earnings call with analysts and investors to discuss its financial results for the third quarter of the 2024 Fiscal Year (the "Q3 2024 Earnings Call"). During the scripted remarks made during the Q3 2024 Earnings Call, Defendant Cook, in relevant part, represented that:

> At our Worldwide Developers Conference, we were thrilled to unveil game-changing updates across our platforms, including Apple Intelligence. Apple Intelligence builds on years of innovation and investment in AI and Machine Learning. It will transform how users interact with technology, from writing tools to help you express yourself, to image playground, which gives you the ability to create fun images and communicate in new ways, to powerful tools for summarizing and prioritizing notifications.
>
> ***Siri also becomes more natural, more useful, and more personal than ever***. Apple Intelligence is built on a foundation of privacy, both through on-device processing that does not collect users' data and through private cloud

---

[3] The Company's fiscal year does not mirror the calendar year, but instead is the 52 or 53 week period that ends on the last Saturday in September.
For the fiscal year starting October 1, 2023-September 28, 2024, the "2024 Fiscal Year."
For the fiscal year starting September 29, 2024-September 27, 2025, the "2025 Fiscal Year."

compute, a groundbreaking new approach to using the cloud, while protecting users' information powered by Apple silicon. We are also integrating ChatGPT into experiences within iPhone, Mac, and iPad, enabling users to draw on a broad base of world knowledge.

We are very excited about Apple Intelligence and we remain incredibly optimistic about the extraordinary possibilities of AI and its ability to enrich customers' lives. We will continue to make significant investments in this technology and dedicate ourselves to the innovation that will unlock its full potential.

88.     During the question-and-answer ("Q&A") portion of the Q3 2024 Earnings Call, Defendant Cook was asked to discuss what Apple was expecting at the time regarding the "promotional environment" over the coming years. Defendant Cook responded, in relevant part, that "[w]e are very excited about Apple Intelligence and what it brings, ***and it is another compelling reason for an upgrade.***"

**September 9, 2024 Press Release**

89.     On September 9, 2024, Apple issued a press release titled "Apple Intelligence comes to iPhone, iPad, and Mac starting next month." This press release represented, in relevant part, that:

Helpful Writing Tools, Mail and notifications summaries, ***a more natural and flexible Siri,*** the Clean Up tool in Photos, and many more Apple Intelligence features roll out in the U.S., with additional English-language support coming later this year[.]

\*\*\*

Today, Apple announced that Apple Intelligence, ***the personal intelligence system that combines the power of generative models with personal context to deliver intelligence that is incredibly useful and relevant,*** will start rolling out next month with iOS 18.1, iPadOS 18.1, and macOS Sequoia 15.1, with more features launching in the coming months. In addition, Apple introduced the new iPhone 16 lineup, built from the ground up for Apple Intelligence and featuring the faster, more efficient A18 and A18 Pro chips — making these the most advanced and capable iPhone models ever.

1
2

\*\*\*

3
4
5
6
7
8
9
10
11

***Siri becomes more natural, flexible, and deeply integrated into the system experience.*** It has a brand-new design with an elegant glowing light that wraps around the edge of the screen when active on iPhone, iPad, or CarPlay. On Mac, a user can place Siri anywhere on their desktop to access it easily as they work. Users can type to Siri at any time on iPhone, iPad, and Mac, and can switch fluidly between text and voice as they use Siri to accelerate everyday tasks. ***With richer language-understanding capabilities, Siri can follow along when users stumble over their words and can maintain context from one request to the next.*** In addition, with Siri's extensive product knowledge, it can now answer thousands of questions about the features and settings of Apple devices. Users can learn everything from how to take a screen recording to how to easily share a Wi-Fi password.

12

\*\*\*

13

**Many More Features to Come**

14
15
16
17
18
19
20
21
22
23
24

More Apple Intelligence features will roll out later this year and in the months following. Image Playground will allow users to create playful images in moments. Image Wand will make notes more visually engaging by turning rough sketches into delightful images. When a user circles an empty space, Image Wand will create an image using context from the surrounding area. Emoji will be taken to an entirely new level with the ability to create original Genmoji by simply typing a description, or by selecting a photo of a friend or family member. ***Siri will be even more capable, with the ability to draw on a user's personal context to deliver intelligence that is tailored to them. It will also gain onscreen awareness, as well as take hundreds of new actions in and across Apple and third-party apps.*** Plus, users have the option to access ChatGPT's broad world knowledge from several experiences within iOS 18, iPadOS 18, and macOS Sequoia, allowing users to access its expertise — as well as its image- and document-understanding capabilities — without needing to jump between tools.

25

***September 16, 2024 Press Release***

26
27

90.    On September 16, 2024, Apple issued a press release entitled "iOS 18 is available today, making iPhone more personal and capable than ever." The press release

28

37
Verified Shareholder Derivative Complaint

stated, in relevant part, that:

**The First Set of Apple Intelligence Features Available Next Month**

Apple Intelligence is deeply integrated into iOS 18, harnessing the power of Apple silicon to understand and create language and images, take action across apps, and draw from personal context to simplify and accelerate everyday tasks — all while protecting users' privacy and security. The first set of Apple Intelligence features will be available next month, delivering experiences that are delightful, intuitive, easy to use, and specially designed to help users do the things that matter most to them.

\*\*\*

***Siri becomes more natural, flexible, and deeply integrated into the system experience.*** It has a brand-new design with an elegant glowing light that wraps around the edge of the screen when active on iPhone. Users can type to Siri at any time on iPhone, and can switch fluidly between text and voice as they use Siri to accelerate everyday tasks. ***With richer language-understanding capabilities, Siri can follow along when users stumble over their words and can maintain context from one request to the next. In addition, with Siri's extensive product knowledge, it can now answer thousands of questions about the features and settings of Apple devices.***

### *Apple's AI Advertising Campaign*

91.     Beginning in September 2024, Apple began to stir excitement surrounding its promised AI features amongst the general public with an advertising campaign featuring actress Bella Ramsey. This advertisement ostensibly showed off Siri's AI capabilities, including personal context and on-screen awareness, supposedly enabling it to help users schedule appointments, and labeled the AI-enhanced version of Siri "more personal." This claim is visible in on-screen text in the advertisement, as displayed below:





***October 28, 2024 Press Release***

92.    On October 28, 2024, Apple issued a press release titled "Apple Intelligence is available today on iPhone, iPad, and Mac." This press release stated in relevant part that:

> "Apple Intelligence introduces a new era for iPhone, iPad, and Mac, delivering brand-new experiences and tools that will transform what our users can accomplish," said Tim Cook, Apple's CEO. "Apple Intelligence builds on years of innovation in AI and machine learning to put Apple's generative models at the core of our devices, giving our users a personal intelligence system that is easy to use — all while protecting their privacy. Apple Intelligence is generative AI in a way that only Apple can deliver, and we're incredibly excited about its ability to enrich our users' lives."

***

**Many More Features to Come**

New Apple Intelligence features will be available in December, with additional capabilities rolling out in the coming months.

Apple Intelligence will add new ways for users to express themselves visually. Emoji will be taken to an entirely new level with the ability to create original Genmoji by simply typing a description, and can also be personalized using a

photo of a friend or family member. Image Playground will allow users to create playful images in moments. Image Wand will make notes more visually engaging by turning rough sketches into delightful images. When a user circles an empty space, Image Wand will create an image using context from the surrounding area.

*\*\*\**

In December, Writing Tools will get even more powerful with the ability for users to describe a specific change they want to apply to their text, like making a dinner party invite read like a poem, or adding more dynamic action words to a résumé. And users will have the option to access ChatGPT's broad world knowledge within Writing Tools and Siri, allowing them to benefit from its image- and document understanding capabilities without needing to jump between tools.

Also coming in December, a new visual intelligence experience will build on Apple Intelligence and help users learn about objects and places instantly, thanks to the new Camera Control on the iPhone 16 lineup.2 Users will be able to pull up details about a restaurant in front of them and interact with information — for example, translating text from one language to another.3 Camera Control will also serve as a gateway to third-party tools with specific domain expertise, like when users want to search Google for where they can buy an item, or benefit from ChatGPT's problem-solving skills. Users are in control of when third-party tools are used and what information is shared.

***In the months to come, Priority Notifications will surface what's most important, and Siri will become even more capable, with the ability to draw on a user's personal context to deliver intelligence that's tailored to them. Siri will also gain onscreen awareness, as well as be able to take hundreds of new actions in and across Apple and  third-party apps***.

Verified Shareholder Derivative Complaint

With Apple Intelligence, Siri can draw on a user's personal context to answer questions.

### October 31, 2024 Press Release

93.     On October 31, 2024, Apple issued a press release in which it announced the Company's financial results for the fourth quarter and full year of the 2024 Fiscal Year. The press release quoted Defendant Cook as stating:

> "Today Apple is reporting a new September quarter revenue record of $94.9 billion, up 6 percent from a year ago . . . During the quarter, we were excited to announce our best products yet, with the all-new iPhone 16 lineup, Apple Watch Series 10, AirPods 4, and remarkable features for hearing health and sleep apnea detection. ***And this week, we released our first set of features for Apple Intelligence, which sets a new standard for privacy in AI and supercharges our lineup heading into the holiday season***."

### October 31, 2024 Earnings Call

94.     The same day, October 31, 2024, Apple held an earnings call with analysts and investors to discuss the Company's financial results for the fourth quarter and full year of the 2024 Fiscal Year (the "FY 2024 Earnings Call"). During the scripted portion of the FY 2024 Earnings Call, Defendant Cook stated in relevant part:

> Apple Intelligence marks the beginning of a new chapter for Apple innovation and redefines privacy and AI by extending our groundbreaking approach to privacy into the cloud with Private Cloud Compute. Earlier this week, we

made the first set of Apple Intelligence features available in US English for iPhone, iPad, and Mac users, with systemwide Writing Tools that help you refine your writing, ***a more natural and conversational Siri***, a more intelligent Photos app, including the ability to create movies simply by typing a description, and new ways to prioritize and stay in the moment with notification summaries and priority messages. And we look forward to additional intelligence features in December, with even more powerful Writing Tools, a new visual intelligence experience that builds on Apple Intelligence, and ChatGPT integration, as well as localized English in several countries, including the UK, Australia, and Canada. These features have already been provided to developers and we're getting great feedback. ***More features will be rolling out in the coming months, as well as support for more languages, and this is just the beginning.***

95.    During the Q&A portion of the FY 2024 Earnings Call, when asked to discuss Apple Intelligence's potential impact on sales volumes for the iPhone 16 line, Defendant Cook stated that "***[o]n Apple Intelligence, we believe it's a very compelling upgrade reason.*** And we'll – but we just launched it three days ago and so what we've got now from a data point of view is the number I just referenced that 18.1 has twice the adoption rate of 17.1." Defendant Cook concluded that "[s]o, that clearly shows a level of interest out there."

### *December 11, 2024 Press Release*

96.    On December 11, 2024, the Company issued a press release titled "Apple Intelligence now features Image Playground, Genmoji, Writing Tools enhancements, seamless support for ChatGPT, and visual intelligence." The press release stated in relevant part:

**Even More Capabilities Coming Soon**

***Additional Apple Intelligence capabilities will be available in the months to come. Siri will be even more capable, with the ability to draw on a user's personal context to deliver intelligence that's tailored to them.*** Siri will also gain onscreen awareness, and will be able to take hundreds of new actions in and across Apple and third-party apps. Priority Notifications will also surface what's most important. In addition, users will be able to create images in Image Playground in a Sketch style, an academic and highly detailed style that

1  uses a vibrant color palette combined with technical lines to produce realistic
2  drawings.

3  ***January 10, 2025 Proxy Statement***

4      97.    On January 10, 2025, the Company filed the 2025 Proxy Statement with the

5  SEC. Defendants Cook, Levinson, Austin, Gorsky, Jung, Lozano, Sugar, and Wagner

6  solicited the 2025 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act,

7  which contained material misstatements and omissions.

8      98.    The 2025 Proxy Statement called for the Company's shareholders to vote to,

9  inter alia: (1) re-elect Defendants Cook, Levinson, Austin, Gorsky, Jung, Lozano, Sugar,

10  and Wagner to the Board; (2) ratify the appointment of Ernst & Young LLP as the

11  Company's independent registered public accounting firm for the 2025 Fiscal Year; and

12  (3) approve, on an advisory basis, the compensation of the Company's named executive

13  officers.

14      99.    Regarding "Board Oversight," the 2025 Proxy Statement stated the following,

15  in relevant part:

16      The Board takes an active role in overseeing corporate and product strategy
17      and seeks to ensure the long-term interests of Apple and its shareholders are
        being served. The Board believes that evaluating the executive team's
18      management of the risks confronting Apple is one of its most important areas
        of oversight. In carrying out this responsibility, the Board is assisted by its
19      committees, each of which considers risks within its areas of primary
20      responsibility and expertise and apprises the full Board of significant matters
        and management's response.

21      100.    Regarding the Code of Conduct, the 2025 Proxy Statement stated the
22  following:

23      Apple seeks to conduct business ethically, honestly, and in compliance with
24      applicable laws. Apple's code of ethics, entitled "Business Conduct: The way
        we do business," sets out the principles that guide Apple's business practices
25      — honesty, respect, confidentiality, and compliance. The code applies to all
26      employees, including Apple's principal executive officer, principal financial
        officer, and principal accounting officer. Relevant sections of the code also
27      apply to the Board. Apple expects its suppliers, contractors, consultants, and
28      other business partners to follow the principles set forth in the code when

providing goods and services to Apple or acting on its behalf. The code is available at apple.com/compliance/pdfs/Business-Conduct-Policy.pdf. Apple intends to disclose any changes to or waivers from this code by posting to our website if disclosure is required by SEC or Nasdaq rules.

Apple's code is managed by the Business Conduct organization, under the oversight of Apple's Chief Compliance Officer. Employees are required to complete training on the code upon joining Apple and annually thereafter. With input from relevant stakeholders and executive leadership, we regularly review and update Apple's code and related policies to ensure they provide clear, actionable guidance to our employees, executive officers, and directors.

Additionally, Apple has an insider trading policy governing the purchase, sale, and other dispositions of Apple's securities that applies to all Apple personnel, including directors, officers, employees, and other covered persons. Apple also follows procedures for the repurchase of its securities. We believe our insider trading policy and repurchase procedures are reasonably designed to promote compliance with insider trading laws, rules and regulations, and listing standards applicable to Apple. A copy of Apple's insider trading policy was filed as Exhibit 19.1 to its Annual Report on Form 10-K for the year ended September 28, 2024.

101. Defendants Cook, Levinson, Austin, Gorsky, Jung, Lozano, Sugar, and Wagner caused the 2025 Proxy Statement to be false and misleading by failing to disclose, inter alia, that: (1) the Company misrepresented how long it would take to incorporate advanced AI-based Siri features into its devices; (2) therefore, it was highly unlikely that these features would  be made available on the iPhone 16; (3) that failing to implement such features would harm iPhone 16 sales; (4) as a result of the foregoing, that the Company's business and/or financial products were consequently overstated; and (5) as a result, Apple's public statements were false and misleading at all relevant times.

102. The 2025 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2025 Proxy Statement was

materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

103.   As a result of Defendants Cook, Levinson, Austin, Gorsky, Jung, Lozano, Sugar, and Wagner causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, inter alia, to: (1) re-elect Defendants Cook, Levinson, Austin, Gorsky, Jung, Lozano, Sugar, and Wagner to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for the 2026 Fiscal Year; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

### *January 30, 2025 Press Release*

104.   On January 30, 2025, Apple issued a press release in which it announced its financial results for the first quarter of the 2025 Fiscal Year. The press release quoted Defendant Cook as stating that:

> "Today Apple is reporting our best quarter ever, with revenue of $124.3 billion, up 4 percent from a year ago . . . We were thrilled to bring customers our best-ever lineup of products and services during the holiday season. ***Through the power of Apple silicon, we're unlocking new possibilities for our users with Apple Intelligence, which makes apps and experiences even better and more personal. And we're excited that Apple Intelligence will be available in even more languages this April.***"

### *January 30, 2025 Earnings Call*

105.   The same day, on January 30, 2025, the Company held an earnings call with analysts and investors to discuss the Company's financial results for the first quarter of the 2025 Fiscal Year (the "Q1 2025 Earnings Call").

106.   During the scripted portion of the Q1 2025 Earnings Call, Defendant Cook stated in relevant part that:

We introduced visual intelligence with camera control to help users instantly learn about their surroundings. Users can also seamlessly access chat GPT across iOS, iPadOS and MacOS. And we were excited to recently begin our international expansion with Apple Intelligence now available in Australia, Canada, New Zealand, South Africa, and the U.K. We're working hard to take Apple Intelligence even further. In April, we're bringing Apple Intelligence to more languages, including French, German, Italian, Portuguese, Spanish, Japanese, Korean, and simplified Chinese, as well as localized English to Singapore and India. ***And we'll continue to roll out more features in the future, including an even more capable Siri.***

Apple Intelligence builds on years of innovations we've made across hardware and software to transform how users experience our products. Apple Intelligence also empowers users by delivering personal context that's relevant to them. And importantly, Apple Intelligence is a breakthrough for privacy and AI with innovations like Private Cloud Compute, which extends the industry-leading security and privacy of Apple devices into the cloud. Apple Intelligence opens up an exciting new frontier and is already elevating experiences across iPhone, iPad, and Mac. We're going to keep investing in innovation and in transformative tools that help users in their everyday lives.

107.   Furthermore, during the Q&A portion of the Q1 2025 Earnings Call, Defendant Cook was asked whether the Company saw "the upgraded series expected in April as something that will, let's say, be the killer application among the suite of features that you have announced in Apple Intelligence?" Defendant Cook replied, in relevant part, that he thought "the killer feature is different for different people" but that he thought that "for most, they're going to find that they're going to use many of the features every day. ***And certainly, one of those is the – is Siri, and that will be coming over the next several months.***"

108.   The statements described in ¶¶ 85-96; 104-107 were materially false and/or misleading when made because, *inter alia*: (1) the Company misrepresented how long it would take to incorporate advanced AI-based Siri features into its devices; (2) therefore, it was highly unlikely that these features would be made available on the iPhone 16; (3) that failing to implement such features would harm iPhone 16 sales; (4) as a result of the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

foregoing, that the Company's business and/or financial products were consequently overstated; and (5) as a result, Apple's public statements were false and misleading at all relevant times.

## **The Truth Emerges**

### *March 7, 2025 Announcement*

109.   On March 7, 2025, Apple made a public announcement that it was at that time indefinitely delaying the promised AI updates to Siri. Multiple news outlets quoted a spokeswoman for Apple as stating that:

> Siri helps our users find what they need and get things done quickly, and in just the past six months, we've made Siri more conversational, introduced new features like type to Siri and product knowledge, and added an integration with ChatGPT. We've also been working on a more personalized Siri, giving it more awareness of your personal context, as well as the ability to take action for you within and across your apps. ***It's going to take us longer than we thought to deliver on these features and we anticipate rolling them out in the coming year***.

110.   This statement was also published the same day by John Gruber, writer and producer of the Apple-focused technology blog *Daring Fireball*. In the article, Gruber criticized Apple's promised AI-based Siri features as having been "vaporware," (i.e., imaginary,) and dismissed the 2024 WWDC advertising as being little more than a "concept video." What is more, Apple stopped running its advertisements promoting the AI-enabled Siri features, going so far as to pull them from its website and the Company's official YouTube account.

111.   On this news, the price per share of Apple's common stock fell by $11.59, or approximately 4.9%, from a close of $239.07 on March 7, 2025, to close at $227.48 on March 10, 2025.

### *March 12, 2025 Morgan Stanley Report*

112.   Subsequently, on March 12, 2025, Morgan Stanley published a report titled "Fewer "(A)pple (I)intelligence Catalysts Temper Upgrade Cycle." In this report, analyst

Erik Woodring lowered his price target for Apple from $275 to $252. The report stated in relevant part:

> ***The delayed rollout of a more advanced Siri means Apple will have fewer features to accelerate iPhone upgrade rates in FY26, and as a result, we reduce our CY25/CY26 iPhone shipments 1-5%, to 230M and 243M, respectively.*** We also incorporate a degree of tariff headwinds in CY25. PT falls to $252.
>
> **Key Takeaways**
>
> ▪ ***The postponement of an advanced Siri integrated into Apple Intelligence is likely to temper N12M iPhone upgrade rates vs. our prior expectations.***
>
> ▪ ***As a result, we are reducing our CY25 and CY26 iPhone shipments to 230M (flat Y/Y) and 243M (+6% Y/Y), respectively, implying a flatter replacement cycle curve.***
>
> ***
>
> **With fewer "shots on goal" to improve iPhone upgrade rates next cycle, we see a more gradual path to shortening of iPhone replacement cycles.** To date, our thesis has been that the combination of (1) more advanced AI features, (2) broader global distribution of these features, (3) upgraded iPhone hardware, and (4) a new iPhone 17 form factor would catalyze an iPhone upgrade cycle starting in FY26 and support share outperformance over the next 12 months. ***However, recent reports that the rollout of a more-advanced Siri has been delayed - which was confirmed by Apple - dampen those prospects, as "an upgraded Siri personal assistant" is the #1 AI feature prospective iPhone upgraders are interested in when upgrading. As a result, we are materially reducing our iPhone forecast and now model 230M shipments in CY25 (flat Y/Y) and 243M shipments in CY26 (+6% Y/Y). At the same time, we are incorporating incremental cost headwinds from China tariffs, as while we believe Apple is taking actions to help mitigate tariffs, it's unlikely that Apple can fully offset this cost without broad tariff exemptions, which have not been granted. Net net, this leaves us with just $8 of earnings power in FY26 (vs. $8.52 previously), which on a 30x target multiple (down from 32x previously), drives our new $252 price target (vs. $275 previously).***

Verified Shareholder Derivative Complaint

\*\*\*

**What's changed? Is a delayed Siri upgrade that important to our iPhone forecast?** ***Yes, and our November '24 AlphaWise Smartphone survey results validate this point***. "Access to Advanced AI Features" was listed as a top 5 driver of smartphone upgrades for the first time, and an "Upgraded Siri digital assistant" was the Apple Intelligence feature prospective new model iPhone buyers (globally) were most interested in[.] ***Furthermore, ~50% of iPhone owners that didn't upgrade to an iPhone 16 acknowledged that the delayed Apple Intelligence rollout had an impact on their decision not to upgrade[.] Given our prior iPhone forecast assumed the iOS18.4 launch in April '25 would integrate a more advanced Siri alongside broader Apple Intelligence language support and accelerate upgrade rates this fall, we believe it is necessary to lower our upgrade rate assumption, and FY26 shipment forecast, as a more advanced Siri is unlikely to be available until after the iPhone 17 launch.*** That's not to say other factors cannot support iPhone growth in FY26 (more on this below), but without a "killer AI app" in market ahead of the iPhone 17 launch, we don't see AI features contributing to accelerating upgrade rates as meaningfully as we did previously.

113.    On this news, the price per share of Apple's common stock fell by $11.16 per share, or approximately 5%, over the following two trading sessions, from a close of $220.84 on March 11, 2025, to close at $209.68 per share on close of March 13, 2025.

***April 3, 2025 Wall Street Journal Article***

114.    On April 3, 2025, the Wall Street Journal published an article discussing in substantial part Apple's failure to date to introduce its promised AI-enabled Siri, titled "Apple and Amazon Promised Us Revolutionary AI. We're Still Waiting."

115.    With respect to Apple, the article stated, in relevant part:

With 'more personal' Siri . . . the tech giant[] ***marketed features [it has] yet to deliver[.]***

\*\*\*

In March, the iPhone maker said that some of its AI Siri enhancements—originally showcased last June as part of iOS 18, which launched in

September-were taking longer to deliver than expected. "We anticipate rolling them out in the coming year," an Apple spokeswoman said.

Apple ran iPhone 16 Pro ad that highlighted how its "more personal Siri" could scan previous calendar appointments to help recall the name of someone you once met at a coffee shop. The company stopped running the ad, and even made it vanish from its YouTube Account.

\*\*\*

***Sure, these tech giants have made different promises, but the theme is the same: We have been misled.***

I understand that this is challenging technology and the cost of getting it wrong is devastatingly high, especially for companies like Apple and Amazon that must build trust with customers. ***But the same responsibility applies to marketing: They shouldn't announce products until they're sure they can deliver them***.

**Pressure to get it out**

I don't need to tell you about the AI mania that has gripped the stock market. If you're a tech company and you're not shouting "AI! AI! AI!" to assure investors and the public you're on it, you might as well go look for the BlackBerry executives' support group.

\*\*\*

Apple's response? Apple Intelligence. Some analysts even predicted "The Great Apple Intelligence iPhone Super Cycle," expecting us to stampede Apple Stores to buy the latest iPhone 16 models just for the new AI tools—despite minimal hardware improvements. ***That never happened.***

\* \* \*

"We see this launch as the start of a multi-year software-driven upgrade cycle," Bank of America wrote in an analyst note around the time of the iPhone 16 announcement in September. But Apple reported that iPhone sales in the quarter ended in December were down nearly 1% from the prior year.

\*\*\*

Verified Shareholder Derivative Complaint

Apple promised the new Siri and Apple Intelligence to those with iPhone 15 Pro and iPhone 16 models. Many of the features, including Writing Tools, Image Playground and notification summaries, rolled out in late 2024, with mixed results. The company never showed off the advanced Siri capabilities—including the ability for the assistant to take actions in apps and understand what's on the screen—after the June keynote presentation.

***

"This is a big lift," Craig Federighi, Apple's senior vice president of software engineering, admitted when I asked about Siri's progress in an October interview. "You could put something out there and have it be sort of a mess. Apple's point of view is more like, 'Let's try to get each piece right and release it when it's ready.'"

As a longtime product reviewer, I agree. I don't want to test something that clearly isn't ready. But when you overhype and underdeliver—and in Apple's case, attempt to convince us these enhancements justify an expensive phone upgrade—we're left wondering: ***Why should we buy your next shiny thing? Where's that trust?***

116.    On this news, the price per share of Apple's common stock fell a further $14.79 per share, or 7.3%, from a close of $203.19 per share on April 3, 2025, to close at $188.13 per share on April 4, 2025.

### June 9, 2025 WWDC

117.    The truth fully emerged on June 9, 2025, at the 2025 WWDC—nearly a year to the day of the original Apple Intelligence announcement. Notably, Apple failed to discuss any new updates for its long-promised Siri features.

118.    The 2025 WWDC was variously described as "underwhelming" and/or "disappointing." CNN published an article titled "The biggest updates Apple just announced for the iPhone, Apple Watch, and other major products," in which it stated, in relevant part, that:

Apple just showed how it plans to incorporate artificial intelligence across all its major products, from translating phone calls to giving the Mac a smarter search bar and more.

***The updates aren't as splashy as announcements from the past two years, which heralded big changes with the [] introduction of Apple Vision Pro and Apple Intelligence AI***. But they still gave consumers and Wall Street a clearer picture of how Apple's AI ambitions will impact its products as the company's biggest rivals barrel ahead in the AI race.

\*\*\*

The more modest improvements introduced at this year's WWDC suggest that Apple may been aiming for something it was certain it could deliver on this time around. It also shows that rather than trying to create one, killer AI app — the company says its delayed, AI-enhanced Siri is still in the works — the iPhone maker wants Apple Intelligence to make all the tools its users interact with a bit smarter and more useful.

***But it's unlikely that any of the announcements made at Monday's event will change the perception that Apple is behind its competitors in AI.*** Many of the updates have already been available on Android phones from Google and Samsung for quite some time.

***The event comes at a time when Apple badly needed a win. Steep AI competition aside, the company is still having a rough year, with ongoing slow iPhone sales growth and a trade war threatening to force the company to raise prices.***

119.   On this news, price per share of Apple's common stock fell a further $2.47, approximately 1.2%, from a close of $203.92 on June 6, 2025, to close at $201.45 on June 9, 2025.

## SUBSEQUENT DEVELOPMENTS

120.   Indeed, Apple's own internal team has admitted that the AI Siri features that the Company had advertised as reasons to purchase its iPhone 16 line of devices were not actually developed as of the 2024 WWDC, or at any time thereafter during the Relevant Period. At an all-hands meeting for Apple's Siri division following the initial

announcement that the features would be delayed indefinitely, Robby Walker, a senior director responsible for Siri's development, stated that the Company had promoted the technology "before it was ready." Walker called these delays "ugly and embarrassing," continuing on to state that "[t]his was not one of these situations where we get to show people our plan after it's done. We showed people before." Walker stated that "to make matters worse," Apple's marketing communications department had wanted to promote the enhancements and included them in a series of marketing campaigns and TV advertisements. The Company thus kept pushing such features as a "key selling point" of the iPhone 16 line of devices, knowing that said line lacked other major hardware or software updates likely to drive higher iPhone sales volumes.

## <u>REPURCHASES DURING THE RELEVANT PERIOD</u>

121.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $81.8 billion to repurchase approximately 361.3 million shares of its own common stock at artificially inflated prices between June 2024 and March of 2025.

122.    According to the Form 10-Q which Apple filed with the SEC on August 2, 2024 (the "Q3 2024 10-Q"), between June 2, 2024 and June 29, 2024, the Company purchased 41,354,000 shares of its common stock at an average price per share of approximately $205.54, for a total cost to the Company of $8,499,901,160.[4]

123.    As the Company's stock was actually worth only $201.45 per share, the price at closing on June 9, 2025, the Company overpaid by approximately $169,137,860 for repurchases of its own stock between June 2, 2024 and June 29, 2024.

124.    According to the Form 10-K which Apple filed with the SEC on November 1, 2024 (the "2024 10-K"), between June 30, 2024 and August 3, 2024, the Company purchased 35,697,000 shares of its common stock at an average price per share of

---

[4] Upon information and belief, these repurchases occurred during the Relevant Period.

approximately $224.11, for a total cost to the Company of $8,000,054,670.

125.    As the Company's stock was actually worth only $201.45 per share, the price at closing on June 9, 2025, the Company overpaid by approximately $808,894,020 for repurchases of its own stock between June 30, 2024 and August 3, 2024.

126.    According to the 2024 10-K, between August 4, 2024 and August 31, 2024, the Company purchased 42,910,000 shares of its common stock an average price per share of approximately $221.39, for a total cost to the Company of $9,499,844,900.

127.    As the Company's stock was actually worth only $201.45 per share, the price at closing on June 9, 2025, the Company overpaid by approximately $855,625,400 for repurchases of its own stock between August 4, 2024 and August 31, 2024.

128.    According to the 2024 10-K, between September 1, 2024 and September 28, 2024, the Company purchased 33,653,000 shares of its common stock an average price per share of approximately $222.86, for a total cost to the Company of $7,499,907,580.

129.    As the Company's stock was actually worth only $201.45 per share, the price at closing on June 9, 2025, the Company overpaid by approximately $720,510,730 for repurchases of its own stock between September 1, 2024 and September 28, 2024.

130.    According to the Form 10-Q which Apple filed with the SEC on January 31, 2025 (the "Q1 2025 10-Q"), between September 29, 2024 and November 2, 2024, the Company purchased 41,627,000 shares of its common stock at an average price per share of approximately $229.51, for a total cost to the Company of $9,553,812,770.

131.    As the Company's stock was actually worth only $201.45 per share, the price at closing on June 9, 2025, the Company overpaid by approximately $1,168,053,620 for repurchases of its own stock between September 29, 2024 and November 2, 2024.

132.    According to the Q1 2025 10-Q, between November 3, 2024 and November 30, 2024, the Company purchased 32,784,000 shares of its common stock at an average price per share of approximately $227.13, for a total cost to the Company of approximately $7,446,229,920.

133.    As the Company's stock was actually worth only $201.45 per share, the price at closing on June 9, 2025, the Company overpaid by approximately $841,893,120 for repurchases of its own stock between November 3, 2024 and November 30, 2024.

134.    According to the Q1 2025 10-Q, between December 1, 2024 and December 28, 2024, the Company purchased 25,739,000 shares of its common at an average price per share of approximately $248.05, for a total cost to the Company of $6,295,260,950.

135.    As the Company's stock was actually worth only $201.45 per share, the price at closing on June 9, 2025, the Company overpaid by approximately $1,182,661,400 for repurchases of its own stock between December 1, 2024 and December 28, 2024.

136.    According to the Form 10-Q which Apple filed with the SEC on May 2, 2025 (the "Q2 2025 10-Q"), between December 29, 2024 and February 1, 2025, the Company purchased 36,809,000 shares of its common stock at an average price per share of approximately $235.43, for a total cost to the Company of $8,665,942,870.

137.    As the Company's stock was actually worth only $201.45 per share, the price at closing on June 9, 2025, the Company overpaid by approximately $1,250,769,820 for repurchases of its own stock between December 29, 2024 and February 1, 2025.

138.    According to the Q2 2025 10-Q, between February 2, 2025 and March 1, 2025, the Company purchased 31,856,000 shares of its common stock at an average price per share of approximately $238.07, for a total cost to the Company of approximately $7,583,957,920.

139.    As the Company's stock was actually worth only $201.45 per share, the price at closing on June 9, 2025, the Company overpaid by approximately $1,166,566,720 for repurchases of its own stock between February 2, 2025 and March 1, 2025.

140.    According to the Q2 2025 10-Q, between March 2, 2025 and March 29, 2025, the Company purchased 39,455,000 shares of its common stock at an average price per share of approximately $221.77, for a total cost to the Company of $8,749,935,350.

141.    As the Company's stock was actually worth only $201.45 per share, the price

at closing on June 9, 2025, the Company overpaid by approximately $801,725,600 for repurchases of its own stock between March 2, 2025 and March 29, 2025.

142.    Thus, the total payment by the Company for its common stock repurchases during the Relevant Period was at least approximately $81.8 billion as the Company repurchased at least approximately 361,524,000 shares of its own common stock. This represents a cumulative overpayment on stock repurchases during the Relevant Period of at least approximately $9 billion.

### DAMAGES TO APPLE

143.    As a direct and proximate result of the Individual Defendants' conduct, Apple has lost and will continue to lose and expend many millions of dollars.

144.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

145.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

146.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

147.    Such losses include the Company's overpayment of approximately $9 billion for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

148.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who

breached their fiduciary duties to the Company.

149.   As a direct and proximate result of the Individual Defendants' conduct, Apple has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

150.   Plaintiffs bring this action derivatively and for the benefit of Apple to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Apple, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

151.   Apple is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

152.   Plaintiffs are, and have been at all relevant times, shareholders of Apple. Plaintiffs will adequately and fairly represent the interests of Apple in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

153.   Plaintiffs incorporate by reference and reallege each and every allegation stated above as if fully set forth herein.

154.   A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Apple's Board consisted of the following eight individuals: Defendants Cook, Levinson, Austin, Gorsky, Jung, Lozano, Sugar, and Wagner (the "Director-Defendants"). Plaintiffs need only to allege demand futility as to four of the eight Director-Defendants that were on the Board at the time this action was filed.

155.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of

the scheme they engaged in to make and/or cause the Company to make false and misleading statements and omissions of material fact, while they caused the Company to repurchase its own stock at artificially inflated prices. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

156.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Apple to issue materially false and misleading statements. Specifically, the Director-Defendants caused Apple to issue false and misleading statements which were intended to make Apple appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

157.   Additional reasons that demand on Defendant Cook is futile follow. Defendant Cook has served as CEO of Apple, and a director thereof, since 2011. He also served as Apple's COO from 2005 until 2011. The Company provides Defendant Cook with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer and an influential member of the Board, Defendant Cook was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including those which he personally made. As the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Cook solicited the 2025 Proxy Statement which contained false and misleading information contributing, *inter alia*, to shareholders voting to reelect himself and Defendants Levinson, Austin, Gorsky, Jung, Lozano, Sugar, and

Wagner to the Board, allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Cook's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, further demonstrate his motive in facilitating and participating in the scheme. Moreover, Defendant Cook is named as a defendant in the Securities Class Action. For these reasons, Defendant Cook breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158.    Additional reasons that demand on Defendant Levinson is futile follow. Defendant Levinson has served as a Company director since 2000 and as the Chair of the Board since at least 2015. Defendant Levinson also serves as a member of the People and Compensation Committee. Defendant Levinson has received and continues to receive handsome compensation for his role as a director. As the trusted Chairman of the Company's Board, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Levinson solicited the 2025 Proxy Statement which contained false and misleading information contributing, *inter alia*, to shareholders voting to reelect himself and Defendants Cook, Austin, Gorsky, Jung, Lozano, Sugar, and Wagner to the Board, allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Levinson's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, further demonstrate his motive in facilitating and participating in the scheme. For these reasons, Defendant Levinson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

159.    Additional reasons that demand on Defendant Austin is futile follow.

Defendant Austin has served as a Company director since February 2024. She also serves as a member of the Audit and Finance Committee. Defendant Austin has received and continues to receive handsome compensation for her role as a director. Additionally, Defendant Austin solicited the 2025 Proxy Statement which contained false and misleading information contributing, *inter alia*, to shareholders voting to reelect herself as well as Defendants Cook, Levinson, Gorsky, Jung, Lozano, Sugar, and Wagner to the Board, allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Austin breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

160.   Additional reasons that demand on Defendant Gorsky is futile follow. Defendant Gorsky has served as a Company director since 2021. He also serves as a member of the People and Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Additionally, Defendant Gorsky solicited the 2025 Proxy Statement which contained false and misleading information contributing, *inter alia*, to shareholders voting to reelect himself and Defendants Cook, Levinson, Austin, Jung, Lozano, Sugar, and Wagner to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Gorsky breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

161.   Additional reasons that demand on Defendant Jung is futile follow. Defendant Jung has served as a Company director since June 2008. She also serves as the Chair of the People and Compensation Committee and as a member of the Audit and Finance Committee. Defendant Jung has received and continues to receive handsome compensation for her role as a director. Additionally, Defendant Jung solicited the 2025 Proxy Statement which contained false and misleading information contributing, *inter alia*, to shareholders voting to reelect her and Defendants Cook, Levinson, Austin, Gorsky, Lozano, Sugar, and Wagner to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Jung breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

162.   Additional reasons that demand on Defendant Lozano is futile follow. Defendant Lozano has served as a Company director since 2021. Defendant Lazano also serves as a member of the Audit and Finance Committee. Defendant Lozano has received and continues to receive handsome compensation for her role as a director. Additionally, Defendant Lozano solicited the 2025 Proxy Statement which contained false and misleading information contributing, *inter alia*, to shareholders voting to reelect herself and Defendants Cook, Levinson, Austin, Gorsky, Jung, Sugar, and Wagner to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Lozano

breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

163.    Additional reasons that demand on Defendant Sugar is futile follow. Defendant Sugar has served as a Company director since 2010. Defendant Sugar also serves as the Chair of the Audit and Finance Committee. Defendant Sugar has received and continues to receive handsome compensation for his role as a director. Additionally, Defendant Sugar solicited the 2025 Proxy Statement which contained false and misleading information contributing, *inter alia*, to shareholders voting to reelect himself and Defendants Cook, Levinson, Austin, Gorsky, Jung, Lozano, and Wagner to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Sugar breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon his is futile and, therefore, excused.

164.    Additional reasons that demand on Defendant Wagner is futile follow. Defendant Wagner has served as a Company director since 2014. Defendant Wagner also serves as a member of the Audit and Finance Committee and as the Chair of the Nominating and Corporate Governance Committee. Defendant Wagner has received and continues to receive handsome compensation for her role as a director. Additionally, Defendant Wagner solicited the 2025 Proxy Statement which contained false and misleading information contributing, *inter alia*, to shareholders voting to reelect herself and Defendants Cook, Levinson, Austin, Gorsky, Jung, Lozano, and Sugar to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal

controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Wagner breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

165.    Additional reasons that demand on the Board is futile follow.

166.    Defendants Sugar (as Chair), Austin, Wagner, and Lozano (collectively, the "Audit and Finance Committee Defendants") served as members of the Audit and Finance Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit and Finance Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

167.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in

an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

168.    Apple has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Apple any part of the damages Apple suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

169.    The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

170.    The acts complained of herein constitute violations of fiduciary duties owed by Apple's officers and directors, and these acts are incapable of ratification.

171.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if there is a directors' and officers' liability insurance policy covering the Director-Defendants. The policy may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Apple, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot

be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

172.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Apple to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

173.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934

174.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

175.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

176.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

177.   Defendants Cook, Levinson, Austin, Gorsky, Jung, Lozano, Sugar, and Wagner caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company misrepresented how long it would take to incorporate advanced AI-based Siri features into its devices; (2) therefore, it was highly unlikely that these features would  be made available on the iPhone 16; (3) that failing to implement such features would harm iPhone 16 sales; (4) as a result of the foregoing, that the Company's business and/or financial products were consequently overstated; and (5) as a result, Apple's public statements were false and misleading at all relevant times.

178.   The 2025 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Furthermore, the 2025 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

179.   In exercise of reasonable care, Defendants Cook, Levinson, Austin, Gorsky, Jung, Lozano, Sugar, and Wagner should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2025 Proxy Statement, including, but not limited to, the re-election of directors.

180.   As a result of Defendants Cook, Levinson, Austin, Gorsky, Jung, Lozano, Sugar, and Wagner causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, inter alia, to: (1) re-elect Defendants Cook, Levinson, Austin, Gorsky, Jung, Lozano, Sugar, and Wagner to the Board, thereby allowing them to continue

breaching their fiduciary duties to the Company; (2) approve the appointment of Ernst & Young as the Company's independent auditor for the 2025 Fiscal Year; and (3) approve, on an advisory basis, executive compensation.

181.    The Company was damaged as a result of the Defendants Cook, Levinson, Austin, Gorsky, Jung, Lozano, Sugar, and Wagner's material misrepresentations and omissions in the 2025 Proxy Statement.

182.    Plaintiffs, on behalf of Apple, have no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Violation of Section 10(b) and Rule 10b-5 of the Exchange Act

183.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

184.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Apple. Not only is Apple now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Apple by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase approximately 361.5 million of its own shares at artificially inflated prices, damaging Apple.

185.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

186.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in

acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Apple not misleading.

187.    The Individual Defendants, as top executives and directors of the Company are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Apple.

188.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

189.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

190.    Plaintiffs, on behalf of Apple, have no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

191.    Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

192.    The Individual Defendants, by virtue of their positions with Apple and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Apple and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had

the power and influence and exercised the same to cause Apple to engage in the illegal conduct and practices complained of herein.

193. Plaintiffs, on behalf of Apple, have no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

194. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

195. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Apple's business and affairs.

196. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

197. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Apple.

198. In breach of their fiduciary duties owed to Apple, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company misrepresented how long it would take to incorporate advanced AI-based Siri features into its devices; (2) therefore, it was highly unlikely that these features would be made available on the iPhone 16; (3) that failing to implement such features would harm iPhone 16 sales; (4) as a result of the foregoing, that the Company's business and/or financial products were consequently overstated; and (5) as a result, Apple's public statements were false and misleading at all relevant times.

199. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements

and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

200.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

201.    In additional breach of their fiduciary duties, the Individual Defendants caused Apple to repurchase millions of shares of Company common stock while the price for said stock was artificially inflated while four of the Individual Defendants engaged in lucrative insider sales, netting combined proceeds of approximately $233.1 million.

202.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Apple's securities.

203.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Apple's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

204. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

205. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Apple has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

206. Plaintiffs, on behalf of Apple, have no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

207. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

208. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Apple.

209. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Apple that was tied to the performance or artificially inflated valuation of Apple or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

210. Plaintiffs, as shareholders and representatives of Apple, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

211. Plaintiffs, on behalf of Apple, have no adequate remedy at law.

**SIXTH CLAIM**
**Against the Individual Defendants for Abuse of Control**

212.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

213.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Apple, for which they are legally responsible.

214.   As a direct and proximate result of the Individual Defendants' abuse of control, Apple has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

215.   Plaintiffs, on behalf of Apple, have no adequate remedy at law.

**SEVENTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

216.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

217.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Apple in a manner consistent with the operations of a publicly held corporation.

218.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Apple has sustained and will continue to sustain significant damages.

219.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

220.   Plaintiffs, on behalf of Apple, have no adequate remedy at law.

**EIGHTH CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

221.   Plaintiffs incorporate by reference and re-allege each and every allegation set

forth above, as though fully set forth herein.

222.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

223.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Apple to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

224.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

225.    Plaintiffs, on behalf of Apple, have no adequate remedy at law.

## NINTH CLAIM
### Against Defendants Cook, Maestri, and Parekh for Contribution Under Sections 10(b) and 21D of the Exchange Act

226.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

227.    Apple and Defendants Cook, Maestri, and Parekh are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Cook's, Defendant Maestri's, and Defendant Parekh's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

228.    Defendants Cook, Maestri, and Parekh, because of their positions of control

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

229.   Accordingly, Cook, Maestri, and Parekh are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

230.   As such, Apple is entitled to receive all appropriate contribution or indemnification from Defendants Cook, Maestri, and Parekh.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiffs may maintain this action on behalf of Apple, and that Plaintiffs are adequate representatives of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Apple;

(c)    Determining and awarding to Apple the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Apple and the Individual Defendants to take all necessary actions to reform and improve Apple's corporate governance and internal procedures to comply with applicable laws and to protect Apple and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.  a provision to permit the shareholders of Apple to nominate at least four candidates for election to the Board;

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding Apple restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated: July 22, 2025                    Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/*Robert C. Moest
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Attorneys for Plaintiffs*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Samhita Gera, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 16 day of July, 2025.

DocuSigned by:

CF385B635442498...

Samhita Gera

## **VERIFICATION**

I, Denish Bhavsar, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 16 day of July, 2025.

DocuSigned by:

*Denish Bhavsar*

92533907A464FC...

Denish Bhavsar